UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GABRIEL ANTONIO ALFARO,

                Petitioner,                  Case Number: 4:16-10677
                                                  Honorable Linda V. Parker

v.

SHERMAN CAMPBELL,

                Respondent.

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY

Gabriel Antonio Alfaro ("Petitioner") is presently in the custody of the

Michigan Department of Corrections pursuant to convictions for two counts of

first-degree criminal sexual conduct, Mich. Comp. Laws § 750.520b(1)(b), and one

count each of second-degree criminal sexual conduct, Mich. Comp. Laws

§ 750.520c(1)(b), delivery of less than 50 grams of cocaine to a minor, Mich.

Comp. Laws § 333.7410(1), and third-degree child abuse, Mich. Comp. Laws

§ 750.136b.  He has filed a petition for a writ of habeas corpus pursuant to 28

U.S.C. § 2254, raising two claims for relief: (1) the admission of evidence

regarding a prior investigation of Petitioner by Children's Protective Services

violated his rights to due process and a fair trial; and, (2) the exclusion of a

videotaped interview of the victim denied him his right to present a defense.  The

Court finds that neither of Petitioner's claims satisfy the strict standards for habeas corpus relief. Therefore, the Court is denying the petition.

## I. Background

Petitioner's convictions arise from a July 2012 altercation with his then 14-year-old daughter, and his earlier sexual assault of his daughter.

At the time of trial, Petitioner's daughter, M.A., was fifteen years old. M.A. testified that she lived with her father in Lincoln Park, Michigan, during the relevant time period. On July 26, 2012, when she was fourteen years old, she drove her father to a CVS pharmacy. (5/21/13 Trial Tr. at 135-37; ECF No. 5-8, Pg. ID 477-79.) She testified that her father had been drinking that night. (*Id.* at 137, Pg ID 479.) When they arrived at CVS, Petitioner was not happy with M.A.'s chosen parking spot, so he "backhanded" her and "smacked" her. (*Id.* at 138, Pg ID 480.) M.A. testified that after Petitioner struck her, she exited the car and walked toward the pharmacy's front doors. (*Id.* at 139, Pg ID 481.) Petitioner drove the car closer to the pharmacy's front doors and ordered M.A. to get into the car. When she did not, he got out of the vehicle, grabbed her by the hair and pulled her into the passenger seat. (*Id.* at 140, Pg ID 482.) Petitioner then drove home.

As M.A. was walking toward the house, Petitioner smacked her again and pushed her into the side of the house. (*Id.* at 132, Pg ID 484.) M.A. testified that she went upstairs to her bedroom while her father remained on the first floor. (*Id.*

at 133, Pg ID 485.)  She texted her boyfriend Kyle, telling him that she anticipated things might get out of hand that night and he might need to come get her.  (*Id.*at 136, Pg ID 488.)  M.A. erased the message immediately after sending it because her father had forbidden her from having contact with Kyle.  Petitioner then came upstairs and took M.A.'s phone away from her.  (*Id.* at 139, Pg ID 491.)

A few minutes later, Petitioner returned to M.A.'s bedroom asking why Kyle was texting her and why she needed Kyle to come get her.  (*Id.* at 138-39, Pg ID 490-91.)  M.A. testified that when she started to cry, her father jumped on top of her bed and started punching her with a closed fist.  (*Id.*at 139, Pg ID 491.)  M.A. blocked her face with her pillow.  Petitioner stopped punching her when she stopped crying.  He ordered her to go downstairs, but she refused.  Petitioner dragged her downstairs by her hair, threw her on a couch, and resumed yelling at her.  (*Id.* at 153-54, Pg ID 495-96.)  Eventually, M.A. ran to the home of her friend, Carol Leigh Breton, approximately one mile from her own.  (*Id.* at 157-58, Pg ID 499-500.)

Once she was safely at her friend's house, M.A. contacted her cousin and her aunt, Angela, who picked her up at approximately 2:30 a.m.  (*Id.* at 165, Pg ID 507.)  As she waited for her family members to pick her up, M.A. showed Carol Leigh her injuries, including a cut to her hand and bumps on her head from where her father struck her.  (*Id.* at 167-68, Pg ID 509-10.)  She also told Carol Leigh that

her father had sexually assaulted her. (*Id.* at 168, Pg ID 510.) M.A. testified that she previously told one other person, her friend Ashley Hanson, that her father had intercourse with her. (*Id.* at 169, Pg ID 511.)

The next day, M.A.'s aunt and cousin took her to the Lincoln Park Police Department, where M.A. gave a report to a police officer. Someone from Child Protective Services (CPS) also interviewed her. (*Id.* at 175, Pg ID 517.) M.A. testified that she did not initially tell the police or CPS that she had been sexually assaulted by her father because she was ashamed and embarrassed and did not want anyone to know what had happened to her. (*Id.* at 183, Pg ID 525.) M.A. did eventually report the sexual assault through a CPS hotline phone number. (*Id.* at 185, Pg ID 527.)

In August 2012, M.A. was interviewed at Kids Talk regarding her allegations against her father. (*Id.*) While she told the interviewer about some of the things her father had done to her, she did not tell the interviewer there had been penetration because she was ashamed and embarrassed. (*Id.* at 187, Pg ID 529.) The first time she specifically told someone in authority that there had been penetration was at her father's preliminary examination on October 30, 2012. (*Id.* at 188, Pg ID 530.)

M.A. testified that one night, when she was fourteen years old, she fell asleep on a couch in the living room of the home she shared with her father. (*Id.* at

193, Pg ID 535.)  She awoke to find her father massaging her back.  (*Id.*)  This, by itself was not unusual as she played softball and he would occasionally massage her back and shoulders to relieve muscle pain.  (*Id.* at 193-94, Pg ID 535-36.)  Eventually, he began massaging her buttocks, which was unusual.  (*Id.* at 194, Pg ID 536.)  He pulled her pants down and licked her buttocks and then her vagina.  (*Id.* at 194-95, Pg ID 536-37.)  Ultimately, he penetrated her vagina with his penis, while calling her by her deceased mother's name.  (*Id.* at 195-200, Pg ID 538-542.)

M.A. testified that her father drank heavily and that he routinely allowed her to drink alcohol.  (*Id.* at 189, Pg ID 531.)  M.A. was aware that her father also used cocaine.  (*Id*. at 201, Pg ID 543.)  Sometime after the sexual assault, she asked him if she could try some.  (*Id.*)  He took her with him to purchase cocaine in downtown Detroit and allowed her to try it.  (*Id.* at 202-07, Pg ID 544-49.)

On cross-examination, defense counsel focused on inconsistencies between M.A.'s earlier accounts of the physical assault at CVS and her trial testimony, including that M.A. had not previously told anyone that her father was intoxicated that evening.  Defense counsel also called into question the veracity of M.A.'s accounts of her injuries, questioning whether M.A.'s reports of bruising were false or exaggerated.

Carol Leigh testified that she and M.A. were best friends.  (5/22/13 Trial Tr. at 65-66, ECF No. 5-9, Pg. ID 619-20.)  She recalled that late in the evening on

July 26, 2012, she saw M.A. outside her home in a disheveled state. M.A. had scratches all over her legs, bumps on her head, and a bloody hand. (*Id.* at 72, Pg ID 625.) That evening, M.A. told Carol Leigh that Petitioner had raped her one or two months earlier. (*Id.* at 78, Pg ID 631.) She also told Carol Leigh that she had previously used cocaine with Petitioner. (*Id.*)

Ashley Hanson testified that M.A. was one of her best friends. (*Id.* at 94, Pg ID 647.) Ashley testified that, in May or June 2012, M.A. told Ashley that her father had raped her and she was concerned she might be pregnant. (*Id.* at 98, Pg ID 651.) M.A. was visibly upset when she shared this information with Ashley. (*Id*. at 99, Pg ID 652.)

Scott Lavis, a police officer for the Lincoln Park Police Department, testified that he was assigned to investigate the allegations against Petitioner. (*Id.* at 104, Pg ID 657.) He arranged for M.A. to attend a Kids Talk interview, which he observed through a closed circuit television. (*Id.* at 108-09, Pg ID 661-62.) According to Officer Lavis' recollection of the Kids Talk interview, M.A. described cunnilingus being performed by her father. (*Id.* at 110, Pg ID 663.) Officer Lavis also recalled that while M.A. did not state that her father's penis penetrated her vagina, her description of what transpired satisfied the legal definition of penetration. (*Id.* at 110-11, Pg ID 663-64.) He testified that he first

heard M.A. state that there had been vaginal penetration during the preliminary examination. (*Id.* at 111, Pg ID 664.)

Petitioner presented three witnesses in his defense: (1) his brother, Frank Alfaro; (2) his sister, Tomasita Alfaro-Koehler; and (3) himself. Frank Alfaro testified that he twice saw M.A. sneak alcohol. (*Id.* at 132-137, Pg ID 685-690.) He never saw his brother hit M.A. (*Id.* at 148, Pg ID 701.) Tomasita Alfaro-Koehler testified that M.A. lived with her from November 2009 through May 5, 2010, when M.A. was 12 years old. (*Id.* at 153-156, Pg ID 707-10.) Alfaro-Koehler admitted that in November 2009, she told a CPS worker that she had concerns about Petitioner's ability to parent M.A. based upon his substance abuse. (*Id.* at 165, Pg ID 719.) She clarified that by "substance abuse" she meant alcohol. (*Id.*)

Finally, Petitioner testified in his own defense. He testified that the argument at CVS was precipitated by M.A.'s erratic driving and his suspicions that she was under the influence of drugs or alcohol. (5/23/13 Trial Tr. at 14-18, ECF No. 5-10, Pg. ID 738-742.) He denied grabbing her by the hair, testifying that he grabbed her by the arm and walked her back toward the car to ensure that she would not try to run away. (*Id.* at 9-10, Pg ID 741-42.) Petitioner told M.A. he was going to drug test her the following day. (*Id.* at 11, Pg ID 743.) He denied there was a confrontation outside when they arrived home. (*Id.*)

According to Petitioner, M.A. immediately went upstairs to her bedroom. (*Id.* at 12, Pg ID 744.) Sometime later, Petitioner went upstairs and found M.A. on her phone and he took it away from her. (*Id.* at 13-14, Pg ID 744-45.) About fifteen minutes later, Petitioner heard banging on the walls upstairs and went to see what M.A. was doing. (*Id.* at 14-15, Pg ID 745-46.) He found M.A. in her bedroom, banging her hands against the walls. (*Id.* at 15, Pg ID 746.) Petitioner told her to go downstairs to call her grandparents. (*Id* at 16, Pg ID 747.) She was unable to contact them. (*Id.*)

Ultimately, M.A. ran from the house. (*Id.* at 17, Pg ID 748.) Petitioner drove to Carol Leigh's house, but M.A. was not there. (*Id.*) He returned home and called Carol Leigh's mother, asking her to contact him if M.A. appeared. (*Id.* at 18, Pg ID 749.) Eventually, Carol Leigh's mother called and Petitioner spoke to M.A. on speakerphone. The two argued and M.A. ran from Carol Leigh's house. (*Id.*at 18-19, Pg ID 749-50.) Petitioner denied ever inappropriately touching M.A. or providing her with drugs. (*Id.* at 19-20, Pg ID 750-51.)

A Wayne County Circuit Court jury convicted Petitioner and, on June 6, 2013, he was sentenced to terms of imprisonment of 10 to 40 years for the first-degree criminal sexual conduct conviction, 10 to 15 years for the second-degree criminal sexual conduct conviction, 10 to 40 years for the delivery of cocaine to a minor conviction, and one to two years for the third-degree child abuse conviction.

Petitioner filed an appeal of right in the Michigan Court of Appeals, raising five claims for relief. The Michigan Court of Appeals affirmed his convictions and sentences. *People v. Alfaro*, Nos. 316827, 316829, 2014 WL 4628861 (Mich. Ct. App. Sept. 16, 2014). Petitioner filed an application for leave to appeal in the Michigan Supreme Court. In lieu of granting leave to appeal, the Michigan Supreme Court reversed the judgment of the court of appeals in part, vacated the sentence for second-degree criminal sexual conduct and remanded for resentencing on that conviction because the sentencing court failed to comply with state sentencing laws in imposing that sentence. *People v. Alfaro*, 497 Mich. 1024 (Mich. 2015). In all other respects, the Michigan Supreme Court denied the application for leave to appeal. *Id.* On remand, Petitioner was sentenced to four to fifteen years for the second-degree criminal sexual conduct conviction.

Petitioner then filed this habeas corpus petition. He raises two claims for relief:

I.      Improperly admitted evidence has violated Mr. Alfaro's right to due process in a state trial under *Chambers v. Mississippi.* Admission of the uncharged misconduct evidence deprived Mr. Alfaro of a fair trial where it lacked any probative value, was unfairly prejudicial and showed only that Mr. Alfaro had been investigated by Child Protective Services. The Michigan Court of Appeals unreasonably applied well-established federal law as determined by the Supreme Court, denying Mr. Alfaro his constitutional right to a fair trial.

II.     Improper exclusion of impeachment evidence.

## II.     Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")

imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted
> with respect to any claim that was adjudicated on the merits in State
> court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

28 U.S.C. § 2254(d).  A decision of a state court is "contrary to" clearly established

federal law if the state court arrives at a conclusion opposite to that reached by the

Supreme Court on a question of law, or if the state court decides a case differently

than the Supreme Court has on a set of materially indistinguishable facts.  *Williams*

*v. Taylor*, 529 U.S. 362, 405-406 (2000).  An "unreasonable application" occurs

when "a state-court decision unreasonably applies the law of [the Supreme Court]

to the facts of a prisoner's case." *Id.* at 409.  A federal habeas court may not "issue

the writ simply because that court concludes in its independent judgment that the

relevant state-court decision applied clearly established federal law erroneously or

incorrectly." *Id.* at 411.

AEDPA "imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010). A "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102. Pursuant to section 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.*

Although § 2254(d) does not completely bar federal courts from re-litigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's precedents. *Id.* A "readiness to attribute error [to a state court] is inconsistent with the presumption that state courts know and follow the law." *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002).

A state court's factual determinations are presumed correct on federal habeas review. *See* 28 U.S.C. § 2254(e)(1). A habeas petitioner may rebut this presumption of correctness only with clear and convincing evidence. *Id.* Moreover, for claims that were adjudicated on the merits in state court, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## III. Discussion

### A. Admission of Prior Child Protective Service Investigation

Petitioner's first claim for relief concerns the prosecutor's questions to Petitioner regarding prior CPS reports and investigations. He argues that the admission of this evidence not only violated Michigan Rule of Evidence 404(b), but also was so egregious as to render his trial fundamentally unfair in violation of his right to due process.

The Michigan Court of Appeals held that this testimony was properly admitted under state law as impeachment evidence. *Alfaro*, 2014 WL 4628861 at *2. Prior to trial, the trial court ruled that evidence of Petitioner's history with CPS was inadmissible except for impeachment purposes. *Id.* At trial, the evidence was admitted to impeach Petitioner's testimony that he did not have a cocaine problem, did not use cocaine with his daughter, that he had not admitted to using cocaine as recently as July 4, 2012, and that he did not have a problem with alcohol. *Id.* The

Michigan Court of Appeals held that the testimony was admitted for impeachment purposes in accordance with the trial court's pre-trial ruling. *Id.* The court of appeals also held that the evidence was not unfairly prejudicial, finding it "probative of defendant's credibility regarding his drug and alcohol use around the time of the allegations, which was relevant to the charged crimes." *Id.*

Petitioner's claim that the admission of this evidence violated Michigan Rule of Evidence 404(b) fails to provide a basis for federal habeas corpus relief. Errors of state law, particularly the alleged improper admission of evidence, do not allege a constitutional violation upon which habeas relief may be granted. *See Estelle v. McGuire*, 502 U.S. 62 (1991).

An evidentiary ruling may support habeas relief where it is "so egregious that it results in a denial of fundamental fairness" and violates the Due Process Clause. *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). The Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling v. United States*, 493 U.S. 342, 352 (1990). "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).

"There is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh*, 329 F.3d at 512. The Supreme Court has discussed when other acts testimony is permissible under the Federal Rules of Evidence, *see Huddleston v. United States*, 485 U.S. 681 (1988), but has not addressed the issue in constitutional terms, finding such are more appropriately addressed in codes of evidence and procedure than under the Due Process Clause. *Dowling*, 493 U.S. at 352. Consequently, there is no "clearly established federal law" to which the state court's decision could be "contrary" within the meaning of section 2254(d)(1). *Bugh*, 329 F.3d at 513.

Petitioner argues that although the admission of other acts evidence has not been specifically prohibited by the Supreme Court, it may still violate the Due Process Clause when its admission violates fundamental fairness. It is true that the introduction of evidence may violate due process when its introduction "is so extremely unfair that its admission violates 'fundamental conceptions of justice.'" *Dowling*, 493 U.S. at 353 (quoting *United States v. Lovasco*, 431 U.S. 783, 790 (1977)). "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." *Id.* The rule regarding the admissibility of evidence and due process is "exceedingly general." *Desai v. Booker*, 732 F.3d 628, 631 (6th Cir. 2013). "'The more general the rule, the more leeway courts

have in reaching outcomes in case-by-case determinations,' *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004), and, it follows, the less likely a state court's application of the rule will be unreasonable." *Id.*

Petitioner argues that, pursuant to the Sixth Circuit Court of Appeals' opinion in *Ege v. Yukins*, 485 F.3d 364 (6th Cir. 2007), the Supreme Court's decision in *Chambers v. Mississippi*, 410 U.S. 284 (1973), controls and warrants relief. In *Chambers*, the Supreme Court held that the exclusion of critical evidence that fell "well within the basic rationale" of a long-established hearsay exception violated due process. *Chambers*, 410 U.S. at 302-03. In contrast to the instant case, *Chambers,* involved the *exclusion* rather than the *admission* of evidence. The *Ege* decision extended *Chambers* to a trial court's admission of evidence. It does not, however, constitute "clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). The Supreme Court has "warned against interpreting its cases broadly" when interpreting the phrase "clearly established Federal law." *Carter v. Horton*, No. 17-1682, 2017 WL 6418076, *2 (6th Cir. Dec. 15, 2017) (citing *Nevada v. Jackson*, 569 U.S. 505, 512 (2013)). "[A] lower court is prohibited from 'refin[ing] or sharpen[ing] a general principle of Supreme Court jurisprudence into a specific legal rule that [the] Court has not announced.'" *Id.* (quoting *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013)).

*Ege's* application of *Chambers* to the admission of evidence, therefore, does not constitute clearly established Federal law.

Moreover, even under a more general fundamental fairness analysis, Petitioner has not shown that the admission of this testimony denied him a fair trial. The trial court narrowly defined the circumstances under which this evidence would be admissible and Petitioner was aware of these parameters prior to testifying. The other acts evidence was relevant to impeach Petitioner's credibility. Under these circumstances, the admission of this evidence did not deprive Petitioner of a fair trial.

### B.    Exclusion of Evidence

Petitioner's second claim for habeas relief concerns the exclusion of a DVD recording of M.A.'s Kids Talk interview, which Petitioner sought to introduce to impeach Officer Lavis' testimony. The Michigan Court of Appeals held that the trial court erred in excluding the DVD, but found the error harmless. Petitioner argues that the Michigan Court of Appeals' finding was an unreasonable application of *Chambers v. Mississippi*, 410 U.S. 284 (1973).

Officer Lavis was the Lincoln Park Police Department officer in charge of investigating the allegations against Petitioner. Officer Lavis testified that he observed M.A.'s Kids Talk interview through a closed circuit television. At Petitioner's trial, Officer Lavis testified, contrary to M.A.'s testimony, that she

described penis to genital penetration during the interview.[1] (5/22/2013 Trial Tr..

at 110, ECF No. 5-9, Pg. ID 663.) Officer Lavis clarified that his definition of

"penetration" was different than the common, layperson's definition. (*Id.*) He

explained that many people consider "penetration" to require full insertion of the

penis into the vagina, but the legal definition does not require full penetration.

(*Id.*) Officer Lavis testified that M.A.'s Kids Talk interview described legal

penetration. (*Id.*)

Following the officer's testimony, outside the presence of the jury, defense

counsel moved for the Kids Talk videotape to be admitted into evidence and be

played for the jury. (*Id.* at 121, ECF No. 59, Pg. ID 674.) The prosecutor opposed

admission of the videotape. Following a recess, the trial court held that, under

Michigan Rule of Evidence 803A, the Kids Talk statement could not be used for

impeachment purposes and that, if it was going to be used for purposes of

corroboration, notice needed to be provided prior to trial. (*Id.* at 124; Pg. ID 677.)

On direct review the Michigan Court of Appeals held that Michigan Rule of

Evidence 803A was inapplicable to the facts of this case and that the trial court

erred in excluding the recording on that basis. *Alfaro*, 2014 WL 4628861 at *3.

Nevertheless, the Michigan Court of Appeals held that this error was harmless

---

[1] As provided earlier, M.A. testified at Petitioner's trial that she did not tell the
interviewer there had been penetration because she was ashamed and embarrassed.
(5/21/13 Trial Tr. at 187, ECF No. 5-8 at Pg ID 529.)

because M.A. testified that "she did not disclose 'penetration' at the Kids Talk interview because she was 'too embarrassed and ashamed of it.'" *Id.* In addition, Officer Lavis clarified that his testimony that M.A. described penetration during the Kids Talk interview was based upon the legal definition of penetration rather than the commonly used definition. *Id.*

The right of a defendant to present a defense has long been recognized as "a fundamental element of due process of law." *Washington v. Texas*, 388 U.S. 14, 19 (1967). It is one of the "minimum essentials of a fair trial." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). But the Supreme Court also recognizes that "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Nevada v. Jackson*, 569 U.S. 505, 509 (2013) (quotation omitted). The exclusion of evidence has been found to be "unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused." *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (internal quotation omitted).

Errors implicating a defendant's right to present a defense are subject to harmless-error analysis. *See Fleming v. Metrish*, 556 F.3d 520, 536-37 (6th Cir. 2009). On federal habeas review, relief may not be granted "based on trial error unless [a petitioner] can establish that it resulted in 'actual prejudice.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *United States v. Lane*, 474 U.S.

438, 449 (1986)). Under this test, relief is proper only if the federal court has "grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict.'" *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). Courts on collateral review must "give a heightened degree of deference to the state court's review of a harmless error decision." *Langford v. Warden*, 665 Fed. App'x 388, 389 (6th Cir. 2016) (citing *Davis v. Ayala*, 576 U.S. —, 135 S. Ct. 2187, 2197 (2015).

The exclusion of the Kids Talk interview did not cause the level of prejudice *Brecht* contemplates. First, M.A.'s and Officer Lavis' trial testimony were not necessarily at odds. Officer Lavis testified that his understanding of penetration was a legal one and included conduct which many people would not commonly characterize as penetration. In light of Officer Lavis' explanation, his testimony and M.A.'s testimony that she did not allege penetration during the Kids Talk interview are not inconsistent. Second, M.A. testified that she did not disclose that penetration had occurred at the Kids Talk interview because she was embarrassed. The fact of M.A.'s prior inconsistent or incomplete statement was, therefore, already before the jury and the video would not have provided impeachment evidence on that point. Finally, if the Kids Talk video affirmed M.A.'s recollection that she did not describe penetration at that time and contradicted Officer Lavis' testimony, Petitioner has not shown that he was prejudiced by its

omission.  The omitted evidence would have corroborated rather than impeached the testimony of the key prosecution witness, M.A.  In a case that rested primarily upon whether the jury credited M.A.'s testimony over Petitioner's, bolstering her credibility would not have bolstered the defense.  The Court denies relief on this claim.

## IV.  Conclusion and Certificate of Appealability

For the reasons stated, the Court concludes that Petitioner is not entitled to habeas relief under § 2254 based on the two grounds asserted in his petition.  In order to appeal the Court's decision, Petitioner must obtain a certificate of appealability.  *See*, *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).   To receive a certificate of appealability, "a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at 336 (2003) (internal quotes and citations omitted).

Reasonable jurists would not find the Court's assessment of Petitioner's claims to be debatable or wrong. The Court therefore declines to issue a certificate of appealability.  The Court is granting Petitioner leave to proceed *in forma*

*pauperis* on appeal because an appeal could be taken in good faith. 28 U.S.C.

§ 1915(a)(3).

Accordingly,

**IT IS ORDERED** that the petition for writ of habeas corpus is **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability is

**DENIED**.

**IT IS FURTHER ORDERED** that Petitioner may proceed *in forma*

*pauperis* on appeal because an appeal may be taken in good faith. 28 U.S.C.

§ 1915(a)(3).

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: June 25, 2018

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, June 25, 2018, by electronic and/or U.S. First Class mail.

s/ R. Loury
Case Manager